VELEZ v TUMA

Docket No. 281136. Submitted April 7, 2009, at Detroit. Decided April 16, 2009, at 9:00 a.m.

Myriam Velez brought a medical malpractice action in the Wayne Circuit Court against Martin Tuma, M.D., alleging that the defendant's failure to timely and properly diagnose and treat her acute vascular insufficiency condition resulted in the amputation of her left leg below the knee. The jury rendered a verdict in favor of the plaintiff, and the court, Cynthia D. Stephens, J., entered a judgment for the plaintiff. The defendant appealed.

The Court of Appeals *held*:

1. The plaintiff alleged that the defendant's negligence resulted in an actual, physical injury and did not plead a loss of an opportunity to avoid physical harm or to obtain a more favorable result. The evidence was sufficient for the jury to conclude that the plaintiff proved the elements of a medical malpractice claim. The defendant was not entitled to a judgment notwithstanding the verdict on the ground that the plaintiff did not sufficiently establish proximate causation.

2. The trial court did not abuse its discretion by denying the defendant's tardy motion for summary disposition that alleged that the plaintiff's notice of intent to file a claim lacked the specificity required by statute.

3. The trial court properly set off from the jury verdict the amount that the plaintiff had already received from other settling tortfeasors. The court was not required to take the setoff from the final judgment after the statutory cap on noneconomic damages was applied. The trial court's application of the common-law setoff rule was proper.

4. The court properly applied the noneconomic damages cap in effect at the time of the final judgment rather than the one in effect at the time the complaint was filed.

5. The trial court did not err by awarding prejudgment interest on the award of past noneconomic damages and not on an apportioned ratio consistent with the award of past noneconomic damages and the award of future noneconomic damages that was set aside.

6. Case evaluation sanctions were properly awarded to the plaintiff, under the facts of this case, on the basis of the defendant's rejection of a case evaluation award in her original lawsuit against the defendant and the other tortfeasors who reached a settlement, which suit was dismissed without prejudice in an order that stated that the plaintiff could refile her lawsuit against the defendant and discovery would carry over and continue.

Affirmed.

1. DAMAGES — MEDICAL MALPRACTICE — JOINT AND SEVERAL LIABILITY — SETOFFS — COMMON-LAW SETOFF RULE.

The common-law setoff rule applies in medical malpractice cases where joint and several liability is imposed; the setoff is properly applied to the jury verdict and does not apply to, and directly reduce, the amount of the final judgment.

2. DAMAGES — MEDICAL MALPRACTICE — NONECONOMIC DAMAGES CAP.

The amount of the statutory cap in effect at the time a judgment is entered is the cap that is applied to an award of noneconomic damages in a medical malpractice action, not the amount in effect at the time that the complaint was filed (MCL 600.1483, 600.6098[1], 600.6304).

*Mark Granzotto, P.C.* (by *Mark Granzotto*), and the *Thurswell Law Firm* (by *Judith A. Susskind*) for the plaintiff.

*Collins, Einhorn, Farrell & Ulanoff, P.C.* (by *Noreen L. Slank* and *Geoffrey M. Brown*), for the defendant.

Before: CAVANAGH, P.J., and FORT HOOD and DAVIS, JJ.

CAVANAGH, P.J. Defendant appeals as of right a judgment in plaintiff's favor following a jury trial in this medical malpractice action. We affirm.

This action arises from defendant's alleged failure to timely and properly diagnose and treat the acute vascular insufficiency condition that plaintiff presented with on February 1, 2000, which resulted in her left leg being amputated below the knee on February 13, 2000.

On appeal, defendant first argues that he was entitled to a judgment notwithstanding the verdict (JNOV) because plaintiff did not establish proximate cause in this purported "lost opportunity" medical malpractice action. After a review de novo of the trial court's decision, and viewing the evidence and all legitimate inferences in the light most favorable to plaintiff, we disagree with defendant. *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003).

To establish medical malpractice, a plaintiff must prove the following elements: (1) the applicable standard of care, (2) breach of that standard, (3) injury, and (4) proximate causation between the alleged breach and the injury. *Weymers v Khera*, 454 Mich 639, 655; 563 NW2d 647 (1997). Thus, plaintiff must prove that defendant's negligence proximately caused her injuries. *Id.* at 647. To establish proximate cause, plaintiff must prove the existence of both cause in fact and legal cause. *Id.*, citing *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994). To prove cause in fact, " 'the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.' " *Weymers, supra* at 647-648, quoting *Skinner, supra* at 164-165. To prove legal cause, "the plaintiff must show that it was foreseeable that the defendant's conduct 'may create a risk of harm to the victim, and . . . [that] the result of that conduct and intervening causes were foreseeable.' " *Weymers, supra* at 648, quoting *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977).

Defendant argues that "*Fulton v [William] Beaumont Hosp*, 253 Mich App 70 [655 NW2d 569] (2002) requires plaintiffs to prove a loss of opportunity of

greater than 50 percentage points to establish causation in medical malpractice cases like this one alleging damages caused by a delay in treatment. Plaintiff failed to do so here." But, as in *Stone v Williamson*, 482 Mich 144; 753 NW2d 106 (2008), this plaintiff did not plead a loss of opportunity claim. Plaintiff sued defendant, alleging that his negligence resulted in an actual, physical injury—the loss of her left leg below the knee. Accordingly, the "lost opportunity doctrine" is not applicable to plaintiff's claim.

A "lost opportunity" cause of action was first recognized in *Falcon v Mem Hosp*, 436 Mich 443; 462 NW2d 44 (1990), a wrongful death case in which the decedent, after giving birth, suffered from an amniotic fluid embolism that caused her death. The subsequent medical malpractice case was premised on the fact that, although this complication was unpreventable, the defendants' failure to start an intravenous line to the decedent before the event occurred deprived the decedent of a 37.5 percent chance of surviving the complication. Thus, although the defendants caused the decedent some harm, more probably than not they did not cause her death. She only had a 37.5 percent chance of surviving even if the intravenous line had been placed, i.e., even if the alleged negligence had not occurred. Nevertheless, the *Falcon* Court noted, the plaintiff was deprived of that opportunity, and the Court held: "We thus see the injury resulting from medical malpractice as not only, or necessarily, physical harm, but also as including the loss of opportunity of avoiding physical harm." *Id.* at 461 (opinion by LEVIN, J.). The *Falcon* Court continued:

> A number of courts have recognized, as we would, loss of an opportunity for a more favorable result, as distinguished from the unfavorable result, as compensable in medical malpractice actions. Under this approach, damages

are recoverable for the loss of opportunity although the opportunity lost was less than even, and thus it is not more probable than not that the unfavorable result would or could have been avoided.

Under this approach, the plaintiff must establish more-probable-than-not causation. He must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm. [*Id.* at 461-462.]

Accordingly, the *Falcon* Court recognized that the loss of a substantial opportunity of avoiding physical harm was actionable and that the loss in that case, of a 37.5 percent opportunity of living, was actionable. *Id.* at 469-470.

The *Stone* Court, in particular Chief Justice TAYLOR, whose opinion was joined by Justices CORRIGAN and YOUNG, further explained the *Falcon* decision:

Under this [loss-of-opportunity] theory, a plaintiff would have a cause of action *independent of that for the physical injury* and could recover for the malpractice that caused the plaintiff to go from a class of patients having a "good chance" to one having a "bad chance." Without this analysis, the plaintiff in *Falcon* would not have had a viable claim because it could not have been shown that the defendant more probably than not caused the physical injury. Until *Falcon*, medical-malpractice plaintiffs alleging that the defendant's act or omission hastened or worsened the injury (such as by failing to diagnose a condition) had to prove that the defendant's malpractice more probably than not was the proximate cause of the injury. [*Stone, supra* at 154-155 (emphasis supplied).]

Justice CAVANAGH, whose opinion in *Stone* was joined by Justices WEAVER and KELLY, similarly explained the holding in *Falcon*:

In sum, when *Falcon* adopted the loss-of-opportunity doctrine, it recognized that the injury of loss of an oppor-

tunity was distinct from the injury of suffering the associated physical harm—which, in that case, was death. [*Id*. at 168.]

In response to the *Falcon* decision, *Weymers, supra* at 649, the Legislature amended MCL 600.2912a by adding subsection 2912a(2), which provides:

In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

As our Supreme Court recognized in *Stone*, the proper interpretation of this statutory language is subject to considerable debate. Chief Justice TAYLOR, joined by Justices CORRIGAN and YOUNG, would hold: "the first sentence of subsection 2 requires plaintiffs in every medical-malpractice case to show the defendant's malpractice proximately caused the injury while, at the same time, the second sentence refers to cases in which such proof not only is unnecessary, but is impossible." *Stone, supra* at 157. On the ground that the two sentences created an incomprehensible paradox, *Stone, supra* at 157-159, these justices would hold that the statute was unenforceable as written. Justice CAVANAGH, joined by Justices WEAVER and KELLY, disagreeing with that interpretation of the second sentence, would hold that the statute was enforceable and "merely sets the threshold for invoking the loss-of-opportunity doctrine" that *Falcon* adopted. *Id*. at 172. That is, "[i]t requires that a plaintiff's premalpractice opportunity to survive or achieve a better result was greater than 50 percent." *Id*. Thus, the plaintiff in *Falcon* would not have met the threshold because his decedent only had a 37.5 percent chance of surviving the complica-

tion even if the defendants had not been negligent. Justices CAVANAGH, WEAVER, KELLY, and MARKMAN in *Stone* "would hold that loss of the opportunity is, by itself, a compensable injury, although the opportunity must be 'lost'—that is, the bad result must occur—in order for a claim to accrue." *Id.* at 164 (opinion by TAYLOR, C.J.).

Here, defendant relies on the case of *Fulton v William Beaumont Hosp*, 253 Mich App 70; 655 NW2d 569 (2002), for his argument that plaintiff was required, and failed, to prove a loss of opportunity claim. We note the statement in *Stone*, that "[a]ll seven justices believe that *Fulton*'s analysis is incorrect or should be found to no longer be good law, though their reasons for doing so vary." *Stone, supra* at 164 (opinion by TAYLOR, C.J.). But because a majority of the *Stone* Court held that the *Stone* case was not a lost-opportunity case, the correctness of *Fulton* could not be reached and it remains undisturbed. *Id.* Thus, we turn to *Fulton*.

In *Fulton*, the medical malpractice claim was premised on the theory that the defendants' failure to properly diagnose and treat the decedent's cervical cancer resulted in a loss of her opportunity to survive. *Fulton, supra* at 73. Thus, like in *Falcon*, the claimed injury specifically pleaded was the loss of opportunity to survive, not a physical injury like the decedent's death. A medical malpractice plaintiff " 'has the burden of proving that he or she suffered an injury . . . .' " *Wickens v Oakland Healthcare Sys*, 465 Mich 53, 60; 631 NW2d 686 (2001), quoting MCL 600.2912a(2). The issue, then, was the burden of proof with regard to causation; specifically, the proofs that were required to show that it was more probable than not that the defendants deprived the decedent of an opportunity to

survive. The *Fulton* Court noted that it had to decide whether the second sentence of MCL 600.2912a(2) required the plaintiff to show that the decedent's initial opportunity to survive before the alleged malpractice was greater than 50 percent, or that the opportunity was reduced by greater than 50 percent after the alleged malpractice. *Fulton, supra* at 77-78. The *Fulton* Court concluded that it was the magnitude of the lost opportunity that was the proper consideration; thus, the opportunity lost because of the defendants' negligence had to be greater than 50 percent. *Id.* at 83.

The case before us is factually distinguishable from *Fulton* and *Falcon*. The claimed injury here is a physical injury—the loss of plaintiff's leg below the knee. This was not a case in which plaintiff was claiming a loss of opportunity of any kind; she claimed that defendant's negligence more probably than not directly caused her to lose her leg below the knee. In other words, this is a traditional case of malpractice. In *Falcon*, the decedent's estate could not bring a traditional medical malpractice case because it could not be established that the defendants' negligence more probably than not caused the decedent's death. In *Fulton*, it appears that, because the theory specifically pleaded by the plaintiff was a loss of the opportunity to survive, *Fulton, supra* at 73, the *Fulton* Court did not consider whether the case could have been treated as one of ordinary medical malpractice, as Chief Justice TAYLOR in *Stone, supra* at 164 n 14, opined. Again, the issue before the *Fulton* Court was how to analyze the causation element when the claimed injury is a loss of opportunity. Thus, the holding in *Fulton* does not support defendant's claim that plaintiff in this case was required to prove a loss of opportunity claim. See MCR 2.111(B)(1); *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 284; 602 NW2d 854 (1999).

Defendant refers us to the case of *Klein v Kik*, 264 Mich App 682; 692 NW2d 854 (2005), in support of his argument that plaintiff's cause of action was a loss of opportunity case. In that wrongful death case, the decedent's estate brought an action premised on the theory that the defendants' failure to properly diagnose the decedent's lung cancer caused the decedent's death. This Court recognized, however, as in the cases of *Falcon* and *Fulton*, that the injury caused by the defendants' alleged malpractice was the loss of an opportunity to survive. *Id.* at 686. Again, *Klein* is factually distinguishable from the case before us; in our case plaintiff suffered a physical injury, the loss of her leg, because of defendant's alleged negligence.

Defendant also refers us to *Ensink v Mecosta Co Gen Hosp*, 262 Mich App 518; 687 NW2d 143 (2004), in support of his position. In that case, the plaintiff suffered a stroke and brought his malpractice action (the plaintiff's wife also brought a claim for loss of consortium) premised on the theory that, if he had been administered a particular drug within a certain time, he would not have suffered paralysis. *Id.* at 521-522. The defendants claimed that the plaintiff could not establish that the failure to administer the drug more probably than not caused the loss of an opportunity to achieve a better result. *Id.* at 522. This Court agreed. The plaintiff's expert's testimony was extremely equivocal. *Id.* at 533-537. He testified that, if the medication had been given, more likely than not it would have had some effect on the plaintiff's condition, but he could not estimate the extent of that effect. *Id.* at 522. He also testified that, without the medication, only 20 percent of stroke victims achieve a full cure. *Id.* at 533. But, when the medication was administered, the cure rate was between 31 percent and, perhaps, as high as 50 percent. *Id.* at 533, 537. This Court concluded that the

plaintiff failed to establish that it was more probable than not that the defendants' alleged malpractice deprived the plaintiff of an opportunity to achieve a better result. *Id.* at 539. The plaintiff only had, possibly, a 31 to 50 percent chance of a better result, even if there had been no negligence. Again, *Ensink* was not a traditional medical malpractice case.

The case before us is more like *Stone* than like the cases relied on by defendant. In *Stone*, the plaintiffs claimed that, if the defendants had properly diagnosed Carl Stone's condition—an abdominal aortic aneurysm, he would not have had to undergo emergency surgery for its rupture, would not have had to have both legs amputated, and would not have suffered additional medical complications. *Stone, supra* at 148 (opinion by TAYLOR, C.J.). Six of the justices held that, despite the defendants' arguments to the contrary, *Stone* was not a lost-opportunity case; rather, it was a claim of "ordinary" or "traditional" medical malpractice. *Id.* at 164-165 (opinion by TAYLOR, C.J.), 185 (opinion of MARKMAN, J., dissenting).

In particular, Chief Justice TAYLOR, whose opinion was joined by Justices CORRIGAN and YOUNG, agreed with the plaintiffs' characterization of the case as "a simple case of physical injury directly caused by negligence." *Id.* at 151. Chief Justice TAYLOR also agreed with the plaintiffs' definition of a loss of opportunity case, which was a case " 'where a plaintiff cannot prove that the defendant's acts or omissions proximately caused his injuries, but can prove that the defendant's acts or omissions deprived him of some chance to avoid those injuries.' " *Id.* at 151. The elements of an "ordinary" or "traditional" medical malpractice claim require the plaintiff to establish that the "defendants' negligence more probably than not caused plaintiff's injuries." *Id.*

at 163. Justice CAVANAGH's opinion, joined by Justices WEAVER and KELLY, began: "I agree with Chief Justice TAYLOR that the evidence presented in this case supports a traditional medical-malpractice claim; thus, I concur that the jury's verdict should be upheld." *Id.* at 165. The primary disagreement between Chief Justice TAYLOR's and Justice CAVANAGH's opinions concerned whether the second sentence of MCL 600.2912a(2) was "incomprehensible and unenforceable." Six justices agreed that the *Stone* case was not a "lost-opportunity" case, and only Justice MARKMAN disagreed with that conclusion.

As in *Stone*, plaintiff's injury in this case was not the loss of an opportunity to avoid physical harm or the loss of an opportunity for a more favorable result; instead, plaintiff suffered the physical harm, the unfavorable result. See *Stone, supra* at 148 (opinion by TAYLOR, C.J.); *Falcon, supra* at 461 (opinion by LEVIN, J.). And plaintiff established, as she was required to, the traditional elements of a medical malpractice claim—defendant's negligence more probably than not caused her left leg below the knee to be amputated. Plaintiff's expert, Dr. Wayne Gradman, testified that when defendant first saw plaintiff at 9:00 a.m. on February 1, 2000, there was a 70 to 80 percent chance of saving her leg. In light of plaintiff's condition, surgery should have been performed by noon that day. Instead of performing emergency surgery to remove blood clots as the standard of care directed, defendant did nothing for 36 hours before performing surgery on February 2, 2000, at about 11:00 p.m. Dr. Gradman testified that there was no explanation regarding why defendant would wait so long to do the necessary surgery. Dr. Gradman further opined that, if defendant had complied with the standard of care, plaintiff would not have lost her leg. This evidence

was sufficient for the jury to conclude that the causation and injury elements were met.

In summary, defendant was not entitled to JNOV on the ground that plaintiff did not sufficiently establish proximate causation. This was not a "lost opportunity" medical malpractice action; thus, *Fulton* and its progeny are not applicable to this case. The burden of proof set forth in the second sentence of MCL 600.2912a(2), as analyzed by *Fulton*, does not apply here. In light of the evidence presented, the jury could have concluded that plaintiff suffered a physical "injury that more probably than not was proximately caused by the negligence of the defendant," and would not have occurred absent that negligence. MCL 600.2912a(2); *Stone, supra* at 163 (opinion by TAYLOR, C.J.). Thus, this issue is without merit.

Next, defendant argues that he was entitled to either JNOV or a new trial because the version of M Civ JI 30.20, the "loss of opportunity" jury instruction, read to the jury was the version that predated the *Fulton* decision and did not indicate that plaintiff had to establish that her chance of receiving a better result fell more than 50 percentage points. However, because we have concluded that this is not a "loss of opportunity" medical malpractice case, this jury instruction was not applicable. See MCR 2.516(D)(2); *Chastain v Gen Motors Corp (On Remand)*, 254 Mich App 576, 590; 657 NW2d 804 (2002). We note, though, that defendant did not object to the instruction as read by the trial court and, thus, failed to preserve the issue for appeal. See MCR 2.516(C); *Ward v Consolidated Rail Corp*, 472 Mich 77, 86 n 8; 693 NW2d 366 (2005). Further, the special jury verdict form actually did state, as question three: "[D]id the plaintiff lose an opportunity to achieve a better result of greater than 50 percent as a result of

[defendant's] professional negligence?" And the jury responded in the affirmative. In any case, appellate relief is not warranted. See MCR 2.613(A).

Next, defendant argues that his motion for summary disposition should have been granted because plaintiff's notice of intent to file a claim lacked the specificity required by MCL 600.2912b. We review de novo a trial court's decision on a motion for summary disposition. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998).

In his argument on appeal, defendant does not even address the trial court's reason for denying his motion for summary disposition—it was untimely and in violation of the trial court's pretrial scheduling order. Plaintiff's notice of intent was filed on March 16, 2001, when she brought a lawsuit against this defendant, Detroit Receiving Hospital, Harper Hospital, and Dr. Lawrence Schwartz. Subsequently, the parties, except for this defendant, reached a settlement agreement. Thereafter, the trial court entered a stipulated order to dismiss that previous case without prejudice, stating that plaintiff could refile her lawsuit against this defendant and discovery would carry over and could continue.

On January 26, 2004, plaintiff did file this case against defendant only. A pretrial order entered by the trial court on June 27, 2005, stated: "All dispositive dispositions and motions in limine are due by 10/01/05. Motions filed after that date will not be considered." On October 11, 2006—over a year after all dispositive motions were due—defendant filed his motion for summary disposition challenging, for the first time, the sufficiency of plaintiff's notice of intent that had been filed five years and seven months earlier. Noting the lengthy history of this case, as well as the deadline for motions set by a pretrial order, the trial court refused to

hear the motion. Defendant does not address in what manner this decision allegedly constituted an abuse of discretion. See *Kemerko Clawson, LLC v RxIV Inc*, 269 Mich App 347, 349; 711 NW2d 801 (2005). Under MCR 2.401(B)(2), a trial court has the authority to set deadlines for the filing of motions. The trial court also has the discretion to decline to consider motions filed after the deadline. *Kemerko, supra.* Defendant has not addressed and, thus has not established, grounds for reversal of the trial court's discretionary decision to decline to consider his very tardy motion for summary disposition. Thus, this issue is without merit.

Next, defendant argues that the trial court erred in its application of the common-law setoff rule because it subtracted the amount of the previous settlement from the jury verdict, instead of from the amount of the final judgment after the statutory cap had been applied. We disagree. Issues concerning setoff are reviewed de novo. *Markley v Oak Health Care Investors of Coldwater, Inc*, 255 Mich App 245, 249; 660 NW2d 344 (2003).

It is undisputed that joint and several liability still exists in medical malpractice cases where the plaintiff is without fault, as in this case. MCL 600.6304(6)(a); *Markley, supra* at 251-252. Thus, "where the negligence of two or more persons produce a single, indivisible injury, the tortfeasors are jointly and severally liable . . . ." *Id.* at 252. That is, each tortfeasor is potentially liable for the full amount of a plaintiff's damages, regardless of a particular tortfeasor's degree of fault. *Id.* at 253; see, also, *Maddux v Donaldson*, 362 Mich 425, 433-434; 108 NW2d 33 (1961). The underlying purpose of joint and several liability "is to place the burden of injustice, if injustice is inevitable, on the wrongdoer instead of on the innocent plaintiff." *Bell v Ren-Pharm, Inc*, 269 Mich App 464, 471; 713 NW2d 285 (2006).

Thus, a defendant is jointly and severally liable even for damages caused by the fault of a person not a party to an action. *Id.* at 470-472.

Under MCL 600.2925d(b), before the tort reform legislation, prior settlements reached by joint tortfeasors before a verdict was reached were credited—or set off—against the jury verdict, reducing the verdict by the settlement amounts. *Rittenhouse v Erhart,* 424 Mich 166, 181-183; 380 NW2d 440 (1985). "Accordingly, by the time of trial, the 'claim' of each plaintiff against the nonsettling tortfeasors was an amount equal to the total damages minus the settlements." *Id.* at 182, citing *Mayhew v Berrien Co Rd Comm,* 414 Mich 399, 410; 326 NW2d 366 (1982). This conclusion made logical sense because, after a settlement agreement is reached with a joint tortfeasor, only part of a plaintiff's "claim" remained—the unsettled part of the claim. In *Kaminski v Newton,* 176 Mich App 326; 438 NW2d 915 (1989), this Court explained that, in cases of joint and several liability where the tortfeasors are liable for a single indivisible injury,

> "[t]he adjudication of the amount of the loss . . . has the effect of establishing the limit of the injured party's entitlement to redress, whoever the obligor may be. This is because the determination of the amount of the loss resulting from actual litigation of the issue of damages results in the injured person's being precluded from relitigating the damages question." [*Id.* at 331, quoting Restatement Judgments, 2d, § 50,comment *d,* p 43.]

So, to arrive at the value of the unsettled, adjudicated part of the plaintiff's claim, the amount of a previous settlement had to be subtracted from the plaintiff's total amount of loss as determined by the finder of fact.

The effect of the setoff was to eliminate a recovery by a plaintiff that was in excess of the actual loss sustained

as determined by the finder of fact. For example, if the loss sustained by a plaintiff was determined to be $100, and the plaintiff had already settled part of his or her claim with a joint tortfeasor for $90, the remaining defendant who had not settled would only be potentially liable for $10. But, if the loss sustained was valued at $100, and the plaintiff had settled part of his or her claim with a joint tortfeasor for $10, the remaining defendant who had not settled would be potentially liable for $90. This reduction of the jury award, like the application of the collateral source rule, MCL 600.6303, recognized that a plaintiff was already compensated, in part, for his or her damages. See *Heinz v Chicago Rd Investment Co*, 216 Mich App 289, 299-300; 549 NW2d 47 (1996). That is, although the plaintiff was entitled to the full amount of the damages the jury determined proper, the source of payment could be split between the defendant and another. *Id.*

The former language of MCL 600.2925d(b) was eliminated by amendment and, with it, the statutory right to set off the amount paid to the plaintiff for the same injury by a settling tortfeasor. However, this Court in *Markley, supra* at 256-257, held that the common-law setoff rule applies in medical malpractice cases where joint and several liability is imposed. In concluding that the common-law setoff rule applies in medical malpractice cases, the *Markley* Court explained:

> With tort reform and the switch to several liability, it is logical to conclude that common-law setoff in joint and several liability cases remained the law, where the new legislation was silent, where application of the common-law rule does not conflict with any current statutes concerning tort law, and where a plaintiff is conceivably overcompensated for its injury should the rule not be applied. Considering the general nature and tone of tort reform legislation, we conclude that the Legislature did not

intend to allow recovery greater than the actual loss in joint and several liability cases when it deleted the relevant portion of § 2925d, but instead intended that common-law principles limiting a recovery to the actual loss would remain intact.

Here, a jury determined that plaintiff was entitled to $300,000 in total damages for wrongful death; however, plaintiff already received $220,000 for wrongful death. Without reduction of the jury verdict, plaintiff receives $520,000 in compensation for a $300,000 harm. If we were to allow such a recovery, we would defeat the principle underlying common-law setoff, that being that a plaintiff can have but one recovery for an injury. [*Id.* at 256-257.]

The issue in this case is whether the settlement amount that plaintiff received from the settling tortfeasors should be set off against the jury verdict, as the trial court decided, or the final judgment after the noneconomic cap is applied, as defendant argues. We agree with the trial court and conclude that the setoff was properly applied to the jury verdict.

We can discern no reason why the same principles that applied to the statutory right to setoffs should not apply to the common-law right to setoffs when joint and several liability is imposed for a single indivisible injury. Here, the jury determined that plaintiff's actual loss for her injury totaled $1,524,831.86. See MCL 600.6304(1)(a). Defendant and the settling tortfeasors were jointly and severally liable for that single indivisible injury. Because a portion of that actual loss was previously paid by the joint tortfeasors through a settlement agreement, plaintiff remains entitled to a potential recovery from this defendant for the remainder of that loss—$1,329,831.86. Under principles of joint and several liability—whose purpose, as stated in *Bell, supra* at 471 is "to place the burden of injustice . . . on the wrongdoer instead of on the innocent plaintiff"— defendant would be liable for the remainder of the dam-

ages but for the application of the collateral source rules and the statutory cap on noneconomic damages. This result is consistent with the purpose underlying common-law setoff—plaintiff is not overcompensated for her injury in that her potential recovery is not greater than her actual loss and she would only be entitled to one recovery for her single injury.

Defendant is correct, though, that the determination of the amount of loss a plaintiff sustained is distinguishable from the amount of loss that is recoverable by force of a final judgment. However, we conclude that the application of the setoff rule to the jury verdict, rather than the final judgment, is proper. When a matter is adjudicated, the plaintiff is exercising his or her constitutional right to have a trier of fact decide the case, including the matter of damages. See *Zdrojewski v Murphy*, 254 Mich App 50, 75-76; 657 NW2d 721 (2002). In cases where joint and several liability is imposed, the trier of fact's determination of damages sets the limit regarding the amount a plaintiff can recover for his or her loss. The common-law rule of setoff is applied to protect and enforce the trier of fact's decision—that is its ultimate purpose. By its application, a plaintiff is entitled to recover only that amount, in total, and not more; but not less either, at least not by operation of this rule of setoff. Again, the purpose of the setoff rule is to ensure that a plaintiff is not *overcompensated* for his or her actual loss as determined by the trier of fact. A single indivisible injury can lead to only a single recovery, even when joint tortfeasors combine to cause that injury and even though each tortfeasor is potentially liable for the entire amount of a plaintiff's damages. Thus the setoff rule applies to the trier of fact's determination of damages, and does not apply to, and directly reduce, the amount of the final judgment.

Here, the jury determined that plaintiff's actual loss totaled $1,524,831.86. To ensure that plaintiff is not overcompensated for her injury, as determined by the jury, the setoff rule applies and the partial payment of $195,000 is subtracted from the jury verdict. In accordance with the imposition of joint and several liability, defendant remained potentially liable to plaintiff for $1,329,831.86, an amount that is not in excess of her actual loss. Defendant's argument that he did not receive a "benefit" from the application of the setoff amount is unavailing. And characterizing this plaintiff's actual recovery of $394,200—as opposed to the jury's award of $1,524,831.86—as a "windfall" is outlandish. Unlike in *Markley*, the jury in this case found that plaintiff suffered actual harm that far exceeded the previously negotiated settlement amount paid by the joint tortfeasors. Because defendant is jointly and severally liable for those damages, he is potentially liable for that remaining amount of the loss. Therefore, the trial court's application of the common-law setoff rule was proper.

Next, defendant argues that the amount of the noneconomic cap in effect at the time plaintiff filed her complaint should have been applied to the final judgment, rather than the cap in effect at the time the judgment was entered. After review de novo of this issue of law, we disagree. See *Robertson v Daimler-Chrysler Corp*, 465 Mich 732, 739; 641 NW2d 567 (2002).

Several statutes contain provisions regarding the application of the statutory cap on awards of noneconomic damages in medical malpractice actions. MCL 600.1483 provides, in relevant part:

> (1) In an action for damages alleging medical malpractice by or against a person or party, the total amount of

damages for noneconomic loss recoverable by all plaintiffs, resulting from the negligence of all defendants, shall not exceed $280,000.00 unless, as the result of the negligence of 1 or more of the defendants, 1 or more of the following exceptions apply as determined by the court pursuant to section 6304, in which case damages for noneconomic loss shall not exceed $500,000:

* * *

(2) In awarding damages in an action alleging medical malpractice, the trier of fact shall itemize damages into damages for economic loss and damages for noneconomic loss.

(3) As used in this section, "noneconomic loss" means damages or loss due to pain, suffering, inconvenience, physical impairment, physical disfigurement, or other noneconomic loss.

(4) The state treasurer shall adjust the limitation on damages for noneconomic loss set forth in subsection (1) by an amount determined by the state treasurer at the end of each calendar year to reflect the cumulative annual percentage change in the consumer price index.

MCL 600.6304 provides, in relevant part:

(1) In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death involving fault of more than 1 person, including third-party defendants and nonparties, the court, unless otherwise agreed by all parties to the action, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings indicating both of the following:

(a) The total amount of each plaintiff's damages.

* * *

(3) The court shall determine the award of damages to each plaintiff in accordance with the findings under subsection (1), subject to any reduction under subsection (5) or section 2955a [impairment defense] or 6303 [collateral

source benefits], and shall enter judgment against each party, including a third-party defendant, except that judgment shall not be entered against a person who has been released from liability as provided in section 2925d.

\* \* \*

(5) In an action alleging medical malpractice, the court shall reduce an award of damages in excess of 1 of the limitations set forth in section 1483 to the amount of the appropriate limitation set forth in section 1483. The jury shall not be advised by the court or by counsel for either party of the limitations set forth in section 1483 or any other provision of section 1483.

And MCL 600.6098(1) provides:

A judge presiding over an action alleging medical malpractice shall review each verdict to determine if the limitation on noneconomic damages provided for in section 1483 applies. If the limitation applies, the court shall set aside any amount of noneconomic damages in excess of the amount specified in section 1483.

Our primary goal in interpreting statutes is to ascertain and give effect to the intent of the Legislature. *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004). We first turn to the language of the statute. *Halloran v Bhan*, 470 Mich 572, 577; 683 NW2d 129 (2004). The fair and natural import of the terms employed, in view of the subject matter of the law, governs. *In re Wirsing*, 456 Mich 467, 474; 573 NW2d 51 (1998). If the plain and ordinary meaning of the language is clear, judicial construction is not permitted. *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 720; 691 NW2d 1 (2005).

To the extent that the applicable statutes relate to the same subject matter or share a common purpose, they are *in pari materia* and are read together as one law. See *Sinicropi v Mazurek*, 273 Mich App 149, 157;

729 NW2d 256 (2006). Read together, the statutes clearly provide that the cap on noneconomic damages applies to an *award* of noneconomic damages. MCL 600.6304(5). An award of noneconomic damages does not exist until the finder of fact renders such a verdict. MCL 600.1483(2), 600.6304(1)(a); see, also, *Jenkins v Patel*, 471 Mich 158, 172; 684 NW2d 346 (2004); *Zdrojewski, supra* at 76-77. A plaintiff awarded damages by the finder of fact has no right to enforce the award until a judgment is entered. See MCR 2.601, 2.602; see, also, *Heinz, supra* at 298. A trial court cannot enter a judgment on the award until the statutory cap on noneconomic damages is applied, if necessary. MCL 600.1483(1), 600.6304(5), 600.6098(1). The statutory cap is applied, if at all, at the time the judgment is entered, and not when the complaint is filed. Thus, the amount of the statutory cap in effect at the time the judgment is entered is the cap that applies to an award of noneconomic damages. Until that time, a plaintiff has no right to enforce a verdict awarding noneconomic damages. See *Wessels v Garden Way, Inc*, 263 Mich App 642, 653; 689 NW2d 526 (2004). Therefore, in this case, the trial court properly applied the noneconomic damages cap in effect at the time the judgment was entered.

Next, defendant argues that the trial court erred in its calculation of prejudgment interest because the court awarded prejudgment interest on the entire award of past noneconomic damages, and not on an apportioned ratio consistent with the past and future noneconomic damages awarded by the jury. After a review de novo of this issue of statutory interpretation, we disagree with defendant. See *Jenkins, supra* at 162.

MCL 600.6013(1) provides that the payment of interest is allowed on a money judgment recovered in a civil

action, but not on future damages. Here, the jury awarded plaintiff $480,000 in past noneconomic damages and $920,000 in future noneconomic damages for the years 2007 through 2029. The jury also awarded plaintiff $28,880 in past economic damages and $95,951.86 for future economic damages. In entering its judgment on the verdict, the trial court adjusted the total verdict by the prior settlement award, then reduced the entire economic damages award to zero because of the collateral source rule, MCL 600.6303, and finally reduced the noneconomic damages award to $394,200 because of the noneconomic damages cap, MCL 600.1483.

On appeal, defendant argues that the reduced award of noneconomic damages must be considered and treated, for purposes of a prejudgment interest calculation, as a ratio of both past and future noneconomic damages because the jury awarded both types of damages. Defendant claims that "[i]gnoring the jury's decision to assign noneconomic damages to both past and future damages would improperly inflate the prejudgment interest award." Defendant's argument is unpersuasive. For the same reason that applying the noneconomic damages cap to reduce the jury's award from $1,400,000 to $394,200 is not considered "ignoring" the jury's decision, applying the cap to only the award of past noneconomic damages is not considered "ignoring" the jury's decision; it is merely the application of the law.

As discussed earlier, a trial court cannot enter a judgment on a verdict until the statutory cap on noneconomic damages is applied, if necessary. MCL 600.1483(1), 600.6304(5), 600.6098(1). The statutory cap is applied, if at all, at the time the judgment is entered. The entry of such a judgment is governed by MCL 600.6306, which provides, in relevant part:

(1) After a verdict rendered by a trier of fact in favor of a plaintiff, an order of judgment shall be entered by the court. Subject to section 2959, the order of judgment shall be entered against each defendant, including a third-party defendant, in the following order and in the following judgment amounts:

(a) All past economic damages, less collateral source payments as provided for in section 6303.

(b) All past noneconomic damages.

(c) All future economic damages . . . .

(d) All future medical and other health care costs . . . .

(e) All future noneconomic damages . . . .

(f) All taxable and allowable costs . . . .

Thus, according to the plain language of the statute, the trial court was required to enter a judgment on all past noneconomic damages before it entered a judgment on all future noneconomic damages. Here, the jury awarded plaintiff $480,000 in past noneconomic damages and that award was required to be reduced to a judgment before the entry of a judgment on the jury's award of $920,000 in future noneconomic damages.

However, MCL 600.6098(1), as set forth above, requires the trial court, in actions alleging medical malpractice, to apply the limitation on noneconomic damages as provided in MCL 600.1483, if necessary, so as to "set aside *any* amount of noneconomic damages in excess of the amount specified . . . ." (Emphasis supplied.) Because, under MCL 600.6306, past noneconomic damages are considered first and the award of $480,000 in past noneconomic damages exceeds the statutory cap of $394,200 in effect at the time of the judgment, the amount of past noneconomic damages set aside is $85,800. The award of $920,000 in future noneconomic damages is also set aside. Because the

award of future noneconomic damages was set aside, the trial court's award of prejudgment interest was not erroneous.

Finally, defendant argues that the trial court improperly awarded plaintiff case evaluation sanctions under MCR 2.403(O) because, purportedly, there was no case evaluation award rendered in this case. As the trial court held, this argument is wholly without merit because a case evaluation did occur and defendant rejected the award.

Plaintiff originally brought a lawsuit in 2001 against this defendant, Detroit Receiving Hospital, Harper Hospital, and Dr. Lawrence Schwartz. A case evaluation was conducted, and defendant rejected the award. Following case evaluation, a settlement agreement was reached with all others, except this defendant. Thereafter, a stipulation and order to dismiss that case without prejudice was entered, which stated that plaintiff could refile her lawsuit against this defendant and discovery would carry over and could continue. After this action was filed, it was scheduled for case evaluation. Defendant responded by filing a motion, arguing that, although case evaluation is mandatory, there was good cause to make an exception under MCR 2.403(A)(2) because "the parties have already gone through case evaluation in the 2001 filing, and submitting the matter for a second case evaluation would only result in undue burden and expense upon the parties." At the hearing on the motion, defense counsel appeared and stated on the record: "This case has previously been filed and it's [sic] previously been case evaluated." The motion was granted.

After the jury rendered a verdict in plaintiff's favor, plaintiff sought case evaluation sanctions. Defendant objected. At the hearing on the objection, the trial court,

which presided over the previous case before it was dismissed by stipulation, indicated that the parties had agreed that another case evaluation did not have to be conducted. Accordingly, the trial court ruled that, when defendant requested that this case be excepted from another case evaluation, it was with the understanding that the previous case evaluation would "apply for whatever purpose a case evaluation would be beneficial." Thus, defendant's objection to the imposition of case evaluation sanctions was denied. In light of the record evidence, including defendant's actions, and the mandatory nature of MCR 2.403(A)(2), as well as the trial court's unique perspective with regard to the pretrial proceedings, we agree with the trial court's decision. See *In re Gazella*, 264 Mich App 668, 679; 692 NW2d 708 (2005).

Affirmed. Costs to plaintiff as the prevailing party. MCR 7.219(A).